IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

FRANK VANDEVELDE,           )
                            )
            Plaintiff,      )
                            )
vs.                         )        Case No. 09-cv-0331-MJR-DGW
                            )
MICHAEL J. ASTRUE,          )
Commissioner of Social Security,  )
                            )
            Defendant.      )

**<u>MEMORANDUM AND ORDER</u>**

REAGAN, District Judge:

A.    <u>Introduction</u>

Pursuant to 42 U.S.C. § 405(g), Frank Vandevelde petitions this Court to review the final decision of the Commissioner of Social Security denying Vandevelde's application for disability insurance benefits (DIB) under the Social Security Act, 42 U.S.C. § 423(a), et seq.  As is discussed further below, in conducting judicial review under § 405(g), a district court is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on the proper legal criteria." ***Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351 (7th Cir. 2005), *citing Scheck v. Barnhart,* 357 F.3d 697, 699 (7th Cir. 2004).**

The court should consider the evidence that supports and the evidence that detracts from the Commissioner's decision, and "the decision

cannot stand if it lacks evidentiary support or an adequate discussion of the issues." **Briscoe, 425 F.3d at 351, *citing Lopez ex rel. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003)***.

The parties have submitted the administrative record (Doc. 10, "R.") and fully briefed their positions (Docs. 17, 23).  For the reasons stated below, the Court affirms the Commissioner's decision.

B.   Procedural Overview and Issues Presented

Alleging that he was disabled due to arthritis and degenerative disc disease beginning September 30, 1999, Vandevelde applied for a period of disability and DIB on September 13, 2005. The Social Security Administration initially denied the claim November 8, 2005 and denied it again via reconsideration on February 15, 2006.   Vandevelde timely requested a hearing in April 2006, which was held before Administrative Law Judge (ALJ) Lawrence D. Wheeler in September 2008.  At the hearing, Vandevelde amended his disability onset date to June 20, 2003.

On October 27, 2008, ALJ Wheeler found Vandevelde not entitled to DIB.  Vandevelde sought review from the Appeals Council of the Social Security Administration.  The Appeals Council denied that request on March 20, 2009, rendering the ALJ's decision the final decision of the Commissioner. **20 C.F.R. § 416.1481; *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008).**  That final decision comes now before this Court for review.

The issues are whether the ALJ properly evaluated the medical opinions in the record, adequately explained his reasoning, and was required to obtain medical expert testimony before reaching his decision.

C.    Summary of Medical History and Evidence

Frank Vandevelde was born February 13, 1952. He completed tenth grade, completed a trade school course in diesel truck mechanics, and had past relevant work as a mechanic. He was 51 years old as of his amended alleged disability onset date – June 20, 2003. He was 54 years old as of his date last insured – September 30, 2006. He claimed disability resulting from rheumatoid arthritis and degenerative disc disease of the spine.

Vandevelde had worked as a diesel truck mechanic. He performed mechanical work on containers and trucks, used tools and equipment involving technical knowledge and skills, and wrote reports (Tr. 98). He performed his job from approximately January 1972 until September 1999 (Tr. 98). Vandevelde estimated that a typical day in that position required him to walk for two hours, stand for four hours, sit for one hour, climb for three hours, stoop for three hours, kneel for three hours, crouch for three hours, crawl for three hours, handle or grasp objects for six hours, reach for four hours, and write, type or handle small objects for two hours (Tr. 98). The job required lifting and carrying parts, brake drums, brake shoes and steel beams of 50 pounds or more frequently, and 100 pounds or more occasionally (Tr. 99).

Vandevelde testified at his September 2008 hearing as follows. After September 1999 and up through 2006, he continued to work part-time out of his basement, rebuilding antique motorcycle generators (Tr. 27-28). He could no longer work his full-time mechanic job, because he could not stand on his feet for any period of time, walking caused him difficulty, and he had pain in his back and ankles. He had been in two automobile accidents, had a whiplash injury to his neck, had a work-related back injury, and had been living with back problems since he was a teenager. He stayed home most of the time, rarely went shopping, had trouble ascending and descending stairs, and drove only when necessary.

Dr. Brian M. Ralston saw Vandevelde on January 5, 1998, for pain from an ankle injury caused by a motorcycle "kick-back." After the injury, Vandevelde reported to the emergency room. Ankle x-rays were negative. Dr. Ralston noted that Vandevelde had no history of ankle or foot injury. Upon examination, Vandevelde's right ankle revealed mild ecchymosis[1] with moderate tenderness over the posteromedial tendons extending a short distance up the medial leg. Vandevelde's Achilles tendon was intact, and he had no tenderness of the proximal fibula, malleoli,[2] navicular or fifth metatarsal, deltoid, or lateral ligaments; nor did he have any lacerations or abrasions. Dr. Ralston suspected

---

[1]    Ecchymosis is "a purplish patch caused by extravasation of blood into the skin." **Stedman's Medical Dictionary 606 (28th ed. 2006).**

[2]    A malleoli is a "rounded bony prominence such as those on either side of the ankle joint." **Stedman's at 1147 (28th ed. 2006).**

a hyper-dorsiflexion/eversion injury.  He recommended Vandevelde continue to use an air cast and attempt to maintain a normal gait.  He prescribed treatment with ice and ibuprofen.  Dr. Ralston restricted Vandevelde's work, recommending standing and walking only 10 percent of the time with no climbing, working at heights, or driving industrial vehicles (Tr. 146).

Dr. Ralston saw Vandevelde on January 12, 1998, as a follow up on the ankle injury. Dr. Ralston again noted that medical findings were consistent with an eversion and dorsiflexion mechanism, causing strain to the posteromedial tendons.  Dr. Ralston noted that Vandevelde had been using an air cast and claimed 25-50 percent improvement.  Dr. Ralston continued work restrictions, limiting Vandevelde's standing/walking to only 50 percent of the time and sitting 50 percent of the time, with no driving industrial vehicles or lifting more than 30 pounds (Tr. 145).

On January 20, 1998, Vandevelde reported 50 percent improvement in his ankle.  Vandevelde was not working at that time, because light duty work was not available.  Dr. Ralston noted that Vandevelde had a mildly antalgic gait, had difficulty squatting due to discomfort, but was able to squat and get back up while holding on to the exam table.

Vandevelde had 75 percent range of motion in the ankle with only mild tenderness on the posterolateral ankle and lower leg.  Dr. Ralston referred Vandevelde to physical therapy for three weeks.   He continued the work

restrictions of 50 percent standing/walking and 50 percent sitting, but he allowed occasional stooping, squatting and driving of industrial vehicles (Tr. 144).

At a February 3, 1998 examination, Dr. Ralston noted that Vandevelde continued to improve but experienced soreness when he stooped or depressed the brake pedal while driving.  Dr. Ralston further noted that Vandevelde felt he could return to work on a trial basis.  At that time Vandevelde had attended four sessions of physical therapy.  Vandevelde exhibited a slow but non-antalgic gait, he transferred easily, and he had full range of motion in the right ankle.  Vandevelde had mild ankle tenderness. Vandevelde was encouraged to try regular work duty but to contact Dr. Ralston if he felt unsafe with any activities.  He ordered Vandevelde to continue physical therapy and to use over-the-counter orthotics to prevent pronation (Tr. 143).

On March 20, 1998, Dr. Ralston noted that Vandevelde was working full duty with discomfort.  He also noted a mildly antalgic gait, mild tenderness over the posteromedial ligaments and mild bilateral pronation.  He referred Vandevelde to a podiatrist for further evaluation/recommendations (Tr. 142).

On October 29, 1998, Vandevelde visited Berwyn Magnetic Resonance Center for an examination of his right ankle and foot. Dr. M. Bresler, a radiologist, reported that the exam revealed intact alignment at the ankle joint with preserved ankle mortise and talar dome.  There were no abnormal

fluid collections, and there was no evidence of tearing (Tr. 147).

On July 13, 1998, Vandevelde saw Dr. Bruce Rachum, a chiropractor, for an initial exam of his lumbar spine.  Dr. Rachum noted that Vandevelde had experienced lower back pain for one to two days.  Vandevelde told Dr. Rachum that the pain began after he lifted and carried a table.  Dr. Rachum also noted Vandevelde's previous right ankle injury, a history of motorcycle accidents, and history of periodic back pain, the most recent episode of which had occurred a few years prior.  Vandevelde had taken Ibuprofen in the past for pain relief but was not suffering from any other conditions at the time or taking any medication (Tr. 176-77).  On a scale from zero to ten, Vandevelde rated his neck pain as a four and his back pain as an eight (Tr. 175).  Vandevelde reported improvement on July 15 and 20, 1998 (Tr. 174).

On December 15, 1998, Vandevelde saw Dr. Slobodan Vucicevic, an orthopedist, for right ankle pain.  Vandevelde reported taking ibuprofen for pain.  Dr. Vucicevic reviewed Vandevelde's MRI results, which showed normal tendon structures, and ruled out a suspected tear of the tibialis tendon.  Dr. Vucicevic noted that Vandevelde was 46 years old at the time of visit, stood 6'4'', and weighed 210 pounds.  He was able to get off the stool he was sitting on when he came into the exam room and was able to walk through the office, although he slightly favored his right leg.  He was able to push on toes and heels and had "vague" discomfort.  Dr. Vucicevic noted no excessive swelling

or trigger points, an uncompromised range of motion, and intact neurovascular status.

Dr. Vucicevic's impression of Vandevelde's condition was tendonitis/sprain. He recommended conservative treatment and determined that Vandevelde could perform regular-duty work at that time (Tr. 191). Dr. Vucicevic prescribed Vandevelde Indocin[3] and Medrol (a steroid) (Tr. 192). He ordered physical therapy, which was to include whirlpool treatment, phonophoresis, exercises and strengthening (Tr. 192). When Vandevelde returned for a second visit on December 28, 1998, Dr. Vucicevic noted Vandevelde had taken all of his medication regularly and did well until the steroids (Medrol) ran out. Vandevelde had been crawling around on the floor setting up Christmas decorations and may have "tweaked" his ankle (Tr. 192).

On January 19, 1999, Dr. Vucicevic noted that Vandevelde's ankle was still a problem. On February 9, 1999, Dr. Vucicevic noted that Vandevelde did not experience problems with his ankle if he took it easy, but if he put too much stress on the ankle it became painful. On that visit, Dr. Vucicevic recommended Vandevelde wear an ankle brace and gave Vandevelde a cortisol injection (Tr. 188). The notes from Vandevelde's March 9, 1999, visit are barely legible, but it appears that Vandevelde was improving, and Dr. Vucicevic

---

[3]    Indocin (Indomethacin) is indicated for the treatment of moderate to severe rheumatoid arthritis, moderate to severe ankylosing spondylitis, moderate to severe osteoarthritis, acute painful shoulder, and acute gouty arthritis. ***Physicians' Desk Reference* 1995 (61st ed. 2007).**

noted that he was able to work (Tr. 188).

On November 3, 1999, Vandevelde reported to Dr. Rachum that his low back pain had increased due to the cold weather (Tr. 173).  On November 4, 1999, Dr. Rachum noted that Vandevelde's condition was unchanged and, despite the use of a heat pack the previous night, he was unable to work that day (Tr. 173).  On November 8, 1999, Dr. Rachum noted Vandevelde should "continue on disability until Wednesday." On November 10, 1999, Dr. Rachum noted Vandevelde's condition was unchanged, and he should "continue on disability through Monday" (Tr. 172).

On November 15, 1999, Dr Rachum noted that Vandevelde's condition was improving, but that he should "continue disability through this week" (Tr. 171).  On November 19, 1999, Dr. Rachum noted that Vandevelde's "symptoms seem to be leveling off" (Tr. 170).  On November 28, 1999, Dr. Rachum once again continued Vandevelde's disability, and on November 29, 1999, Rachum noted that Vandevelde "had a bad night Saturday – trouble sleeping – felt better with use of support belt" (Tr. 169).

X-rays of Vandevelde's lumbar spine taken on December 3, 1999 revealed moderate scoliosis at L3, osteoarthritis and narrowed disc spaces between L3-4, and "lumbar characteristics" on six other lumbar vertebrae (Tr. 167).  On December 8, 1999, Dr. Rachum noted that Vandevelde's low back pain increased after he lifted a 50-pound case of motorcycle parts

(Tr. 168).   On December 20, 1999, Dr. Rachum noted that Vandevelde's condition was worse and that he was experiencing low back pain and stiffness while working on a model train set in his garage (Tr. 165).   On December 29, 1999, Dr. Rachum noted that Vandevelde "woke up stiff, felt good throughout day until he used the vacuum cleaner" (Tr. 164).

On January 7, 2000, Dr. Rachum noted that Vandevelde's condition was improving and that he had been "taking it very easy at home" (Tr. 163). On January 12, 2000, Dr. Rachum provided Vandevelde with some exercises to do with a Theraband to help his low back pain (Tr. 162).   On January 14, 2000, Dr. Rachum made note of decreased low back pain but some neck and upper back pain (Tr. 162).   On January 19, 2000, Dr. Rachum noted that Vandevelde "had some pain yesterday doing some tiling work on bathroom wall" (Tr. 161). On January 26, 2000, Dr. Rachum noted Vandevelde's condition had worsened and he experienced pain while lifting a 5-6 pound model train (Tr. 160).   Dr. Rachum recommended Vandevelde see Dr. Vucicevic as a specialist (Tr. 160).

On a referral from a Dr. Mazanec (who had treated Vandevelde's back), on February 8, 2000, Vandevelde returned to Dr. Vucicevic with complaints of low back and right ankle pain.   Vandevelde was not taking any medication at the time of visit.   He was 48 years old, 6'4'', and approximately 220 pounds.   Dr. Vucicevic noted that Vandevelde did not appear to be in acute distress.   He was able to walk fairly steadily with no antalgic gait, to walk on

toes and heels, and to squat and get up without the support of a table or chair. He had nearly full flexion in a standing position and only minimal tightness in the paraspinal muscles.  There were no signs of radiculopathy.  Straight leg and stretch tests were negative.  Sensation was not altered, nor was vascularity impaired.  His ankles revealed signs of arthritic changes.

Dr. Vucicevic's impression was low back pain without radiculopathy, mild myofascial sprain, and mild facet joint arthritis (Tr. 186).  Dr. Vucicevic recommended Vandevelde continue with physical therapy to include hot packs, ultrasounds, range of motion exercises, and gentle strengthening to lower back. Dr. Vucicevic also suggested Vandevelde take Indocin and Flexeril[4] (Tr. 187).

On February 9, 2000, Dr Rachum noted that Dr. Vucicevic had prescribed Vandevelde unspecified medications and recommended he not work for two weeks (Tr. 158).  On February 14, 2000, Dr. Rachum noted that Vandevelde's condition was improving, but he experienced low back pain when he moved his motorcycle in the garage, and the pain interfered with housework (Tr. 157).  On February 23, 2000, Dr. Rachum noted that Dr. Vucicevic had recommended Vandevelde retire from work as a mechanic and look into receiving disability benefits (Tr. 156).

Vandevelde returned to Dr. Vucicevic on February 22, 2000,

---

[4]     Flexeril (Cyclobenzaprine HCI) is indicated as an adjunct to rest and physical therapy for relief of muscle spasms associated with acute painful musculoskeletal conditions. ***Physicians Desk Reference 1832 (60th ed. 2006).***

complaining of re-injury.   Dr. Vucicevic noted that anything beyond minor exertion caused Vandevelde pain.   He opined that Vandevelde's recent injury did "not correlate with facet joint irritation" but likely was caused when he did not balance his weight properly pushing a snow blower (Tr. 185).   Dr. Vucicevic advised Vandevelde to bend and lift using his hips and knees to take stress off his lower back.   He directed Vandevelde to continue taking Aleve and prescribed Vicodin[5] for extreme pain.   Dr. Vucicevic opined that symptomatic management was the best way to handle Vandevelde's condition at that time (Tr. 185).

On August 26, 2002, Dr. Rachum saw Vandevelde for a new onset of lower back pain (Tr. 153-55).   On September 10, 2002, Dr. Rachum noted that Vandevelde was "feeling pretty good," and his condition was improving (Tr. 152).   On September 19, 2002, Dr. Rachum noted that Vandevelde's pain was acute.   He was experiencing neck pain, but his lower back pain had improved (Tr. 152).   On September 23, 2002, Vandevelde reported persistent neck pain that had worsened over the weekend (Tr. 149).

Vandevelde saw Dr. Vucicevic again on April 22, 2003.   He opined that Vandevelde suffered from multiple joint, cervical spine, and lower back pain, and ankle sprain.   Dr. Vucicevic prescribed Vioxx, or in the alternative, Aleve.   He referred Vandevelde to a rheumatologist for evaluation of systemic or rheumatoid arthritis, in which case other medication might be indicated.

---

[5]     Vicodin (Hydrocodone Bitartrate and Acetaminophen Tablets, USP) is indicated for the relief of moderate to moderately severe pain. ***Physicians Desk Reference* 531 (60th ed. 2006).**

Dr. Vucicevic noted that he did not see Vandevelde as a surgical candidate but opined that Vandevelde was disabled, because he could not perform his previous work, and his pain and arthritis interfered with the activities of his daily living.  Vandevelde followed up with Dr. Vucicevic on May 5, 2003, at which time he described his pain level as a four or five on a scale from zero to ten.  He reported taking Vioxx daily.

X-rays of Vandevelde's lumbar spine, thoracic spine, sacroiliac joints and pelvis taken on June 29, 2003, indicated that Vandevelde suffered from levoconvex rotary scoliosis centered at L2-3 and severe degenerative disc disease along the right aspect of the right L2-3 disc space. Vandevelde had moderate to severe disc height loss at L4-5 and to a lesser extent at L5-S1, also suggestive of underlying degenerative disc disease (Tr. 193).  The x-rays demonstrated no significant degenerative change or arthritic component to the sacroiliac joints and only minimal sclerosis about the pubic symphysis (Tr. 193). The x-rays revealed only minimal degenerative osteophyte formation in the mid dorsal spine (Tr. 194).

On October 24, 2005, Vandevelde saw Dr. Vittal Chapa for an agency-ordered evaluation. Vandevelde reported to Dr. Chapa that he could not stand for any period of time and could not depress the gas pedal with his right foot while driving due to ankle pain. Vandevelde reported a history of head and back injury.  He stated that a few months prior he could not finish a 1.5-mile

hike. Vandevelde reported that his back "goes out" on him and he struggles to pick himself up off the floor.

Vandevelde reported not taking any prescription drugs at the time (Tr. 201).  Dr. Chapa noted that Vandevelde was alert and oriented (Tr. 202).  Dr. Chapa thoroughly evaluated Vandevelde both mentally and physically.  Knee and ankle reflexes were symmetric and Vandevelde had no pathological reflexes.  There was no evidence of joint redness, heat, swelling, or thickening.  Dr. Chapa found no evidence of paravertebral muscle spasm.  Vandevelde performed both fine and gross manipulations with both hands.  Vandevelde had stasis dermatitis of both legs, without edema or ulcerations.   Dr. Chapa diagnosed chronic back pain and history of right ankle pain.

In summary, Dr. Chapa stated that Vandevelde "has multiple vague symptoms of back pain, right ankle pain."  Dr. Chapa reported full range of motion of the joints and no difficulty ambulating.  Vandevelde had no difficulty getting on and off the exam table.  His gait was steady, and there was no evidence of lumbar radiculopathy (Tr. 203).

On November 7, 2005, an agency physician, C.A. Gotway, evaluated Vandevelde's medical records and completed a Physical Residual Functional Capacity Assessment (Tr. 207-214).  The agency evaluator found, based on the medical records, that Vandevelde could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk for a total of six hours in an

eight-hour workday, sit for a total of about six hours in an eight-hour workday, and perform unlimited pushing and/or pulling (Tr. 208).

Regarding postural limitations, Vandevelde could occasionally climb ramps, stairs, ladders, ropes, or scaffolds; frequently balance; occasionally stoop; and frequently kneel, crouch and crawl (Tr. 209). No manipulative, visual, communicative or environmental limitations were established (Tr. 210-11). The evaluator noted that there were no treating or examining source statements regarding Vandevelde's physical capacities in his file (Tr. 213). The agency evaluator referred to Vandevelde's "TP exam" on February 8, 2000, and noted the diagnosis of low back pain without radiculopathy, mild myofascial sprain, mild facet joint arthritis (Tr. 214). The agency evaluator also referred to the "TP exam" from April 2003 at which Vandevelde complained of multiple joint pain, and the June 20, 2003, x-rays which revealed "severe degenerative disc disease along right aspect of L2-3 disc space and moderate to severe height loss at L4-5 and to lesser extent at L5-S1" (Tr. 214). The agency physician also referred to the October 24, 2005 examination in which Vandevelde exhibited full range of motion in the spine and in all joints of the upper and lower extremities (Tr. 214).

On March 9, 2007, Vandevelde went to the Herron Chiropractic Clinic complaining of upper back and left shoulder pain with some lumbar pain and popping in his left knee (Tr. 237).

On September 12, 2007, Vandevelde saw orthopedist Alan Froehling, M.D.   Vandevelde reported chronic pain in his neck, upper and lower back and left foot, as well as scoliosis.  Examination revealed that Vandevelde had only mild restrictions in his range of motion, negative straight leg raising, and intact reflexes.  In a September 2007 letter to Dr. Kent Herron (who had referred Vandevelde to Dr. Froehling), Froehling stated Vandevelde "definitely has evidence of spinal arthritis at multiple levels." Dr. Froehling continued, "essentially there is no surgical pathology, but he does have some evidence of degenerative change, possibly some of it is post-traumatic" (Tr. 235).   Dr. Froehling noted that he does not "think we have a cure for him," and there probably is not a way to relieve him of all of his symptoms. Dr. Froehling discussed the use of Ibuprofen and Ultram ER  for pain management (Tr. 236).

On October 2, 2007, Vandevelde saw Dr. Akhter, a rheumatologist, to be evaluated for rheumatoid arthritis in his ankles, neck and back, and to a lesser degree his hands and wrists (Tr. 251).  Dr Akhter reported subtle cystic arthritic changes, soft tissue swelling of the proximal 2nd digit, erosion developing at the head of the 2nd metacarpal on the lateral view (which could represent evidence of gout), and old post-traumatic deformities (Tr. 250).

Vandevelde saw Dr. Akhter again on October 11, 2007.  Blood tests were positive for rheumatoid arthritis.  X-rays showed amputation of the right 4th finger and some very subtle cystic changes developing in the heads of the

2nd and 3rd right phalanges and head of the 3rd metacarpal.  There were cystic arthritic changes in the head of the 2nd metacarpal on the lateral view.  X-rays of the feet showed mild arthritic changes.  Dr. Akhter planned to do an Anti-Nuclear Antibody (ANA) profile for rheumatoid arthritis and urinalysis (Tr. 243).

As noted above, Vandevelde had seen Dr. Alan Froehling in September 2007 at the Neuromuscular Orthopedic Institute.  Vandevelde's lab work revealed a rheumatoid factor of 106, which was very high (Tr. 253).  Dr. Froehling noted that Vandevelde might be a candidate for a more aggressive biological intervention, or that the rheumatoid factor result might be a lab error.

The doctor noted that Vandevelde seemed to be doing a little better and advised Vandevelde to increase his dosage of Ultram to 200 mg a day and then in four days increase it to 300 mg if he needed additional pain control (Tr. 253).  Dr. Froehling's September 26, 2007 notes indicate that Vandevelde's symptoms were under control. Vandevelde was advised to take 300mg of Ultram ER daily for the next month (Tr. 254).  Vandevelde returned on October 31, 2007.  Upon examination, Dr. Froehling found no neurological symptoms. Dr. Froehling noted he "certainly wouldn't escalate to a stronger or more potent narcotic in the absence of any acute findings" (Tr. 254).

On August 18, 2008, Vandevelde returned to Dr. Froehling still complaining of various pains throughout his body.  Examination revealed generalized stiffness, but no focal neurologic deficits. Vandevelde walked slowly

and stiffly and had restricted motion in the lumbar spine. Dr. Froehling prescribed Ibuprofen and Ultram ER (Tr. 254).

On that date, Dr. Froehling performed a functional assessment, which determined the following.  Vandevelde could frequently lift up to 10 pounds, occasionally lift 11-20 pounds, and never lift 21-50 pounds. Vandevelde could frequently carry up to 10 pounds, occasionally carry 11-20 pounds, and never carry 21-50 pounds (Tr. 227).  Vandevelde could sit for 4 hours, stand for 2 hours, and walk for 2 hours at one time without interruption. He could sit for 4 hours, stand for 2 hours, and walk for 2 hours total in an eight-hour work day (Tr. 228). He not require assistance of a cane (Tr. 228).

Vandevelde was right-hand dominant but capable of occasionally reaching (overhead), occasionally reaching (all other), occasionally handling, occasionally fingering, frequently feeling, and occasionally pushing or pulling with his left hand (Tr. 229).  Vandevelde could occasionally operate foot controls with both his left and right foot (Tr. 229).  Due to his rheumatoid arthritis, Vandevelde could occasionally climb stairs, never climb ladders or scaffolds, occasionally balance, occasionally stoop, never kneel, never crouch, and never crawl (Tr. 230).

Regarding his tolerance to certain conditions, Vandevelde could occasionally tolerate unprotected heights and moving mechanical parts, frequently tolerate operating a motor vehicle, humidity and wetness,

occasionally tolerate dust, odors, fumes and pulmonary irritants, never tolerate extreme heat or cold, occasionally tolerate vibration, and moderately tolerate noise (Tr. 231).

Dr. Froehling further opined that Vandevelde could perform activities like shopping and traveling without assistance. Vandevelde could ambulate without a wheelchair, walker, two canes or two crutches. Vandevelde could not, however, walk a block at a reasonable pace on rough or uneven surfaces. Vandevelde could use public transportation and could climb a few steps at a reasonable pace with the use of a single hand rail.  Vandevelde could prepare a simple meal, feed himself, care for his own hygiene, and sort, handle, and use paper or files (Tr. 232).  Dr. Froehling noted that the above-mentioned limitations were present for two years prior to the exam and could be expected to last for at least 12 more consecutive months (Tr. 232).

At the September 11, 2008 hearing before ALJ Wheeler, Vandevelde was represented by his attorney, Gary Szczeblewski. Dr. Ron Huttikiama, a vocational expert, was also present (Tr. 25).

As explained earlier, Vandevelde testified that he could not work because arthritis pain prevented him from standing on his feet for any period of time and made walking difficult, that he had trouble with day-to-day-living, and that his pain (experienced since he was a teenager) had worsened over time (Tr. 26-27).

Vandevelde testified regarding his career as a mechanic performing engine overhauls (which he had not done since the mid-1980s). He stated "When I worked at CBSL Tank Lines, I did light repairs on liquid vault containers.  My last job, as a truck mechanic, was doing trailer repairs," which mainly involved roof repairs, electrical work, and wiring for brake lights (Tr. 31-32).

With regard to his medical history, Vandevelde testified that he last saw Dr. Froehling at the Neuromuscular Orthopedic Institute three weeks before the hearing, on August 18, 2008.  Vandevelde could not remember how he had described his pain to the doctor.  When asked what he had told Dr. Froehling, Vandevelde stated, "I said I may be the same, maybe a little worse" (Tr. 32-33).  Vandevelde testified he was taking prescription medication for pain, including Ibuprofen and Ultram, prescribed by Dr. Froehling (Tr. 33). Vandevelde testified that he experienced side effects from the Ultram, which he claimed slowed his reflexes and muddled his thinking.  He was taking Ibuprofen and Ultram daily, even though sometimes they did not seem to help (Tr. 34).

Vandevelde testified that he lived with his wife and that his children had grown up and moved out of the home (Tr. 34).  He further testified to the following.  He does not cut the grass or do any yard chores.  Inside the house, he picks up after himself, but his wife does the cooking, laundry and vacuuming.  He can cook something in the microwave, and he can use the

dishwasher (Tr. 35).

On examination by his attorney, Vandevelde testified regarding his scoliosis (Tr. 35).  He stated that he has pain in his spine from one end to the other and the pain in his cervical spine causes numbness in both of his hands, which sometimes causes him to drop things, slows down his fingers, and negatively affects his grip (Tr. 36).  Vandevelde testified that on a good day he can lift fifteen or twenty pounds, but on a bad day he can lift only a cup of coffee.  He testified that he had "two, maybe three" good days a week (Tr. 36).

Vandevelde testified that he can sit for an hour, and if he shifts positions it seems to help.  He cannot stand for very long, maybe a half hour to an hour. He can walk a few hundred feet before he must sit down. Vandevelde testified that in an eight-hour day he does not think he can sit more than six hours.  Vandevelde explained that he must lie down frequently, and not counting sleeping, he usually lies down two or three times per day for a half an hour to a couple of hours at a time (Tr. 37).  Vandevelde testified that in an eight-hour workday he is able to stand for less than six hours.  Vandevelde described the pain in his lower torso as usually a six or seven on a scale of zero to ten.  He sometimes cannot pick himself up off the floor and he must roll to the side and push himself up with his arms (Tr. 38).

Vocational expert Dr. Huttikiama testified that he reviewed the exhibits in the case and was present during Vandevelde's testimony at the

hearing (Tr. 39). Huttikiama testified that Vandevelde's past work as a truck mechanic was considered medium, skilled work.  The ALJ asked Dr. Huttikiama to consider a hypothetical of a 56-year-old with the same education, training, work experience and limitations as Vandevelde.  Dr. Huttikiama testified such a person could not perform Vandevelde's past relevant work, because "he can only occasionally climb and stoop" (Tr. 40).

Dr. Huttikiama testified, however, that Vandevelde could do *other* work in the national economy.  Dr. Huttikiama explained two possible job options available to Vandevelde.  The first position, a packager, was unskilled, medium exertion, and did not require climbing or stooping. At the time of the hearing there were approximately 1,000 packaging jobs in the local economy and approximately 600,000 to 700,000 nationally. The second position, a food preparer, was also unskilled, medium exertion, and did not require climbing or stooping. At the time of the hearing there were approximately 2,000 food preparer jobs in the local economy and approximately 700,000 to 800,000 nationally (Tr. 40-41).

D.    The ALJ's Decision

ALJ Wheeler denied benefits on October 27, 2008 (Tr. 22).  As is discussed below, the ALJ evaluated Vandevelde's application through step five of the sequential analysis (*see* 20 C.F.R. § 404.1520) and concluded that Vandevelde was not suffering from a disability as defined in the Social Security

Act, because he could perform other work in the national economy.

The ALJ determined that (a) Vandevelde had the severe impairments of degenerative disc disease and rheumatoid arthritis, but (b) he did *not* have an impairment or combination of impairments that met or medically equaled the requirements of any impairment in the Listing of Impairments (Tr. 13-15).  **20 C.F.R. pt 404, subpt P, app. 1, pt A**.

The ALJ found that Vandevelde last met the insured status requirements of the Social Security Act on September 30, 2006 (Tr. 12) and that through his date last insured (DLI), Vandevelde had the residual functional capacity (RFC) for a range of medium work.[6]

### E.    Analysis of the ALJ/Commissioner's Decision

To qualify for DIB, a claimant must be "disabled" under the Social Security Act**, 42 U.S.C. § 423(a)(1)(E).**  The Act defines "disabled" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by

---

[6]      "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." **20 C.F.R. § 404.1567(c).**  If someone can do medium work, he is considered also able to perform light and sedentary work. *Id.*

medically acceptable clinical and laboratory diagnostic techniques.  **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

The Social Security regulations prescribe a sequential five-step test to determine whether a claimant is disabled.  ***Briscoe*, 425 F.3d at 351-52.** The ALJ must evaluate a claim for disability under this mandatory five-step analysis.  ***Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009).**

That sequence involves these determinations:

(1) whether the claimant is presently employed;

(2) whether the claimant has an impairment or combination of impairments that is *severe*;

(3) whether the impairment meets or equals one of the *listed* impairments acknowledged to be conclusively disabling (*see* 20 C.F.R. § 404, Subpt P, App. 1);

(4) whether the claimant can perform his or her past relevant work; and

(5) whether the claimant is capable of performing *any work* within the economy, given his or her age, education and work experience.

***Briscoe*, 425 F.3d at 351-52, *citing Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004).  *Accord Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992); 20 C.F.R. §§ 416.920(b-f) and 404.1520(b-f).**

To determine whether the claimant is able to perform his past work or is capable of performing other work (steps four and five), the ALJ assesses the claimant's residual functioning capacity (RFC).  RFC is defined as "the most

[the claimant] can still do despite [his] limitations," and the ALJ should determine the RFC based on all the relevant evidence in the record. **Simila**, **573 F.3d at 513**, *citing* **20 C.F.R. §§ 404.1545(a) and 416.945(a).** *See also Liskowitz v. Astrue,* **559 F.3d 736, 739-40 (7th Cir. 2009).**

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...." **42 U.S.C. § 405(g)**. The United States Court of Appeals for the Seventh Circuit has explained that this statute calls for de novo review of an ALJ's *legal* determinations but deferential review of *factual* determinations. Indeed, as to the latter, the court must uphold any decision that is supported by substantial evidence. **Getch,** **539 F.3d at 480;** **Skinner v. Astrue**, **478 F.3d 836, 841 (7th Cir. 2007).**

So, this Court's task is not to decide afresh whether Frank Vandevelde was, in fact, disabled. Instead, this Court must decide whether ALJ Wheeler's legal determinations were erroneous and, more to the point in this case, whether his factual findings were supported by substantial evidence. **Id.**

The United States Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richardson v. Perales**, **402 U.S. 389, 401 (1971),** *quoted in Skinner***, 478 F.3d at 841. Accord Terry v. Astrue**, **580 F.3d 471, 475 (7th Cir. 2009)(Substantial evidence means evidence that a**

**reasonable person would accept as adequate to support the
conclusion).**

The Seventh Circuit has articulated the "substantial evidence" test
this way:  "An ALJ's findings are supported by substantial evidence if the ALJ
identifies supporting evidence in the record and builds a logical bridge from that
evidence to the conclusion."  ***Hopgood v. Astrue*, 578 F.3d 696, 698 (7th
Cir. 2009),** *citing **Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007).**

In reaching his decision, the ALJ "has the obligation to consider all
relevant medical evidence and cannot simply cherry-pick facts that support a
finding of non-disability while ignoring evidence that points to a disability
finding."  ***Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010),** *citing*
***Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).**  The ALJ "need not
mention every piece of evidence," as long as he constructs that "logical bridge
from the evidence to his conclusion."  ***Denton*, 596 F.3d at 425.**

In reviewing the ALJ's decision for substantial evidence, the district
court considers the entire administrative record as a whole but *may not* re-
weigh evidence, resolve conflicts, decide questions of credibility, or substitute
its judgment for that of the ALJ.  ***Terry,* 580 F.3d 475.**  The undersigned
Judge has examined the record according to these guiding principles.

Claimant Vandevelde contends that the ALJ's decision should be
reversed, because ALJ Wheeler was unfair, incorrectly evaluated the medical

evidence, failed to sufficiently credit the opinion of Vandevelde's treating physician (Dr. Froehling), and impermissibly "played doctor" instead of "seeking the testimony from a medical expert" (Doc. 17, pp. 8-10).

The record before this Court does not support these contentions. To the contrary, the record indicates that ALJ Wheeler properly evaluated the medical opinions, considered the objective medical evidence and other evidence in assessing Vandevelde's complaints, and adequately explained his reasoning.

At step one, ALJ Wheeler found that Vandevelde did not engage in substantial gainful activity during the period from his amended onset date of June 20, 2003 through his DLI of September 30, 2006 (Tr. 12).

At step two, the ALJ found Vandevelde to have two severe impairments: (1) degenerative disc disease of the spine and (2) rheumatoid arthritis (Tr. 13). ALJ Wheeler found, however, that these impairments did not meet or equal any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525 and 404.1526) (Tr. 15). ALJ Wheeler considered the fact that there were no medical imaging reports to confirm fracture, musculoskeletal abnormality, or any other impairment of Vandevelde's ankles, feet, shoulders, elbows, or other joints.

The ALJ also noted that Vandevelde's subjective complaints of chronic pain, stiffness, awkward gait, and difficulty getting up from off the ground have not "been confirmed, to the degree described by the claimant; and

there is no objective medical evidence to reasonably support the degree of limitation described by the claimant" (Tr. 15).

Regarding Vandevelde's diagnosis of rheumatoid arthritis, the ALJ stated that "the Claimant's only prescribed medication is for pain control or muscle relaxation (Ultram and Ibuprofen).  There is no prescribed steroid medication indicated anywhere in the medical evidence" as would be expected with arthritis (Tr. 16).  Regarding the degenerative disc disease, the ALJ stated that the objective medical findings of disc degeneration were done in 2003 and were not updated prior to the hearing.  Furthermore, the record showed no evidence of nerve root impairment or radiculopathy, and all straight-leg raising testing was negative.  Thus, there was insufficient objective evidence that Section 1.04, or any other musculoskeletal listing, was met or equaled (Tr. 16).

At step three, the ALJ found Vandevelde to have an RFC to perform the full range of medium work as defined in 20 C.F.R. § 404.1567(c) (Tr. 17).  In reaching this conclusion, an ALJ must first determine whether there is an underlying medically determinable physical or mental impairment(s); if so, the ALJ evaluates the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities (Tr. 17).

In evaluating Vandevelde's RFC, ALJ Wheeler considered Vandevelde's testimony that part of his pain condition was the result of car

Page 28 of  36

accidents which occurred 36-40 years ago, yet Vandevelde worked for years at medium- and heavy-exertional jobs.  The ALJ did not find any explanation for how Vandevelde's condition had changed such that he now was *unable* to work due to the injuries from those accidents.  The ALJ also considered Vandevelde's admission that he does not like taking medication.  ALJ Wheeler stated:  "this suggests noncompliance with the recommended treatment" (Tr. 19).

ALJ Wheeler found inconsistencies between Vandevelde's statements regarding the restrictions in his day-to-day activities and his medically determinable impairments.  ALJ Wheeler also noted inconsistencies between Vandevelde's testimony that he had continued to rebuild antique motorcycle generators in his basement and his statements that he could not work.  The ALJ further found that Vandevelde's activities were inconsistent with his reported chronic pain.   Taken together, the ALJ found Vandevelde's descriptions of his residual functional capacity and levels of chronic pain not fully credible (Tr. 18-19).

At step four, the ALJ found that through his DLI, Vandevelde was unable to perform any past relevant work under 20 CFR § 404.1565 (Tr. 21).

At step five, the ALJ considered the testimony of vocational expert Dr. Huttikiama, who opined that Vandevelde had no transferable skills to jobs available with the residual functional capacity assessment indicated (Tr. 21). ALJ Wheeler concluded that, considering Vandevelde's age, education, work

experience and RFC, there were other jobs that existed in significant numbers in the national economy that Vandevelde could have performed through the DLI (Tr. 21).

The ALJ considered the Medical-Vocational Guidelines as a framework for decision-making.  He considered additional testimony of the vocational expert that Vandevelde could perform other medium exertional work, such as packing or preparing food, work that existed in the local and national economy (Tr. 22).

In conclusion, the ALJ found Vandevelde not disabled, as defined in the Social Security Act, at any time from June 20, 2003 (the amended onset date) through September 30, 2006 (the DLI)(Tr. 22). This squares with the definition of disability under the Social Security Act and regulations, which require both that the person's impairments result from anatomical, physiological, or psychological abnormalities which can be demonstrated by medically acceptable clinical and laboratory diagnostic techniques *and* that the impairments prevent the person from performing previous work *or* any other kind of substantial gainful work which exists in the national economy. **42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A), 1382c(a)(3)(B), 1382c(a)(3)(D).**

Vandevelde argues that ALJ Wheeler failed to create a proper bridge from the evidence to his conclusion.  Specifically, Vandevelde asserts that Wheeler failed to afford any weight to treating physician Froehling's functional

capacity evaluation (FCE) and failed to sufficiently articulate his conclusion.  The undersigned Judge finds no merit in these contentions.  ALJ Wheeler properly rejected Froehling's opinion and adequately explained why he did so.

As to the argument that ALJ Wheeler violated the "treating physician's rule" in discrediting Dr. Froehling's assessment of Vandevelde's functional limitations, it is true that agency regulations provide that greater weight be afforded to the opinions of treating physicians.  This is because, generally, such opinions are "likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone...." **20 C.F.R. § 404.1527.**

The opinion of a treating physician is not always entitled to deference, however.  In ***Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)**, the Seventh Circuit held that a treating physician's opinion "is entitled to controlling weight if it is well supported by the medical findings and not inconsistent with other substantial evidence in the record," but a claimant is not "entitled to disability benefits simply because a physician finds that the claimant is 'disabled' or 'unable to work.'" ***Id*.  Accord *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004)(treating physician's opinion regarding the nature and severity of a medical condition "is entitled to controlling**

weight if supported by the medical findings and consistent with substantial evidence in the record"). *See also Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); 20 C.F.R. § 416.927(d)(2).

Clearly, medical "evidence may be discounted if it is internally inconsistent or inconsistent with other evidence.**" *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995); 20 C.F.R. § 404.1526 ("The weight given a physician's statement depends upon the extent to which it is supported by medically acceptable clinical and laboratory diagnostic techniques").

Dr. Froehling prepared a functional capacity assessment in August 2008 indicating that Vandevelde could do less than the full range of sedentary work due to his rheumatoid arthritis. But Dr. Froehling stated that this assessment reflecting Vandevelde's stamina and capacity for the past two years (Tr. 232). The assessment did not even purport to evaluate Vandevelde's condition as of the relevant period – June 20, 2003 through September 30, 2006 (the disability onset date of June 20, 2003 through the DLI).

Moreover, ALJ Wheeler properly discounted Dr. Froehling's medical opinion, because his findings were inconsistent with his own clinical progress notes and objective testing, as well as the other medical evidence in the record (including evidence from both examining and treating doctors). The record is replete with evidence supporting the ALJ's conclusions as to the medical evidence.

Stated another way, substantial evidence supports the ALJ's conclusion that Vandevelde was capable of working.  At his last appointment with Dr. Froehling, Vandevelde stated his condition was about the same as it was a year ago.  At the time of the hearing, Vandevelde was able to walk without the use of crutches, a cane, or other assistance.  He had continued to work after his car accidents (which he had indicated initially caused his back pain), and as of the time of the hearing, Vandevelde was still able to work rebuilding motorcycle generators.  Dr. Ralston noted that Vandevelde felt he could return to work on a trial basis, that he had a slow but non-antalgic gait, that he could transfer easily, and that he had full range of motion in his ankle. Later, X-rays showed the ankle was intact and there were no abnormal fluid collections or  sign of torn ligaments.

In 1999, Dr. Rachum noted that Vandevelde's symptoms seemed to be leveling off.  In 2002, Dr. Rachum noted that Vandevelde's low back pain was much improved.  Dr. Vucicevic noted that Vandevelde was able to walk, had no excessive swelling or trigger points, and did not appear to be in acute distress.  In short, the ALJ's RFC determination was supported by the 2003 functional examination conducted by treating physician Vucicevic, the June 2003 x-rays of the lumbar spine, Dr. Chapa's October 2005 consultative examination report, and the updated 2007 treating notes by Dr. Froehling.

Although medical evidence to the contrary exists, the medical

opinions described above support a finding of non-disability and establish that the ALJ's conclusion was supported by substantial evidence on the record as a whole.  Furthermore, ALJ Wheeler adequately explained his determination – discussing specifics as to the lack of evidence, flagging inconsistencies undermining Vandevelde's claims, and reviewing both the objective medical evidence and the other evidence of Vandevelde's complaints.

Similarly devoid of merit is Vandevelde's argument that the ALJ "played doctor" by making his own medical findings instead of calling a medical expert at the hearing.   ALJ Wheeler was not required to call a medical expert and did not play doctor.  Yes, an ALJ has discretion to solicit and consider the opinion of a medical expert as to the nature and severity of a claimant's impairment.  ***See* 20 C.F.R. § 404.1527(f)(2)(iii).**  But when the evidence before the ALJ suffices, he acts within his discretion in deciding not to call a medical expert.  ***See, e.g., Skarbek*, 390 F.3d at 504.**

The instant case does *not* parallel the case relied on by Vandevelde, ***Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)**.  In ***Rohan***, the ALJ disregarded the most recent objective evidence of the claimant's limitations and "simply indulged his own lay view of depression" in making his determination. ***Id*. at 971.**

Here, the ALJ did not use his own judgment.  Rather, ALJ Wheeler gave deference to the consultative examination completed by Dr. Chapa on

October 24, 2005 (which found Vandevelde could do medium work), relied on the functional assessment done by the state agency on November 7, 2005, addressed Vandevelde's most recent visit with Dr. Froehling, and factored in Vandevelde's admission that he did not like taking medication (suggesting non-compliance with recommended treatment).   ALJ Wheeler found direct inconsistencies between Vandevelde's alleged functional loss and his admitted activities.   Based on these and other inconsistencies, the ALJ found Vandevelde's allegations of pain and functional limitations not credible.

ALJ Wheeler was under no mandate to call an outside medical expert at the hearing; there was sufficient evidence in the record as to Vandevelde's condition, limitations and impairments. ALJ Wheeler did not substitute his judgment or "play doctor."  He addressed the various pieces of medical evidence as well as the testimony given at the hearing and explained the reasons buttressing his conclusions.  The ALJ did not err by not obtaining further testimony from a medical expert.

F.    Conclusion

When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to [his] conclusion," and he may not rely on his own lay opinions to fill evidentiary gaps in the record.  ***Clifford*, 227 F.3d at 872; *Blakes v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003).**   In the instant case, ALJ Wheeler conducted the requisite five-step sequential analysis under

20 C.F.R. § 404.1520, properly evaluated the record before him, *and* constructed a logical bridge "between the facts of the case and the outcome." **Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010).**

For all these reasons, the Court **AFFIRMS** the final decision of the Commissioner.  The Clerk of Court **SHALL ENTER JUDGMENT** in favor of Defendant Commissioner and against Plaintiff Vandevelde.

IT IS SO ORDERED.

DATED August 4, 2010.

s/ **Michael J. Reagan**
Michael J. Reagan
United States District Judge